**Elpis SAKARIA, individually and as personal representative of the Estate of Jagdish Sakaria, Deceased; Alexander J. Sakaria; Raj J. Sakaria; Maria K. Sakaria, Children of Jagdish Sakaria, Deceased, Plaintiffs–Appellants,**

v.

**TRANS WORLD AIRLINES,**
Defendant–Appellee.

No. 92–1642.

United States Court of Appeals,
Fourth Circuit.

Argued March 3, 1993.

Decided Oct. 25, 1993.

Nicholas Hamner Cobbs, Law Offices of Nicholas H. Cobbs, Washington, DC, argued (Nicholas Gilman, Gilman, Olson & Pangia, on the brief), for plaintiffs-appellants.

John Niebrugge Romans, Katten, Muchin & Zavis, New York City, argued (Raymond L. Mariani, Katten, Muchin & Zavis, on the brief), for defendant-appellee.

Before ERVIN, Chief Judge, PHILLIPS, Circuit Judge, and HILL, Senior Judge of the United States Court of Appeals for the Eleventh Circuit, sitting by designation.

## OPINION

PHILLIPS, Circuit Judge:

Around a day and a half after completing his flight as passenger on a TWA international flight from New York to Athens, Greece, Jagdish Sakaria died of a heart attack. His widow and children (the Sakarias) brought this diversity action against TWA seeking damages for his death under Maryland wrongful death and survival statutes and, by later procedural developments, under the Warsaw Convention, alleging that the death occurred as a result of trauma occasioned by events associated with a terrorist attack in the Rome airport during the TWA flight's intermediate stop there. The district court dismissed all the claims by summary judgment. We affirm, though on reasoning independent of the district court's.

### I

Jagdish Sakaria decided to visit his children, then attending school in Greece and living there with his wife's parents, in December of 1985. Acting on his behalf, Mrs. Sakaria contacted TWA and requested a nonstop flight from New York to Athens prior to Christmas. The TWA international ticketing agent told her no such flights were available. When asked when the next available flight was, the agent referred her to Flight 840, on December 26. Although TWA's timetable lists Flight 840 as having a scheduled stopover (without saying where), TWA's agent made no mention of that fact, and Mrs. Sakaria didn't inquire about it. To take advantage of a coupon, Mrs. Sakaria and her husband purchased the ticket through a local travel agent later that same day. Neither ticket nor itinerary reflected the intermediate stop in Rome.

On December 26 Mr. Sakaria took Flight 840, and as it approached Rome's Fiumicino Airport on the morning of December 27, terrorists attacked the TWA ticket counter and embarkation area, leaving fourteen people dead and many others wounded. Consequently, Fiumicino flight control forbade Flight 840 to make its scheduled stop there, but when the plane was also denied permission to land at nearby Campino and its captain made clear that he lacked fuel to proceed further, Fiumicino flight control reconsidered and directed the plane to land and park on a remote section of the tarmac.

Once on the ground, the captain told his passengers of an "armed altercation" at the airport and warned them that the aircraft would be met by a security vehicle and held on the tarmac until it was safe to approach the terminal. One armored vehicle remained near the aircraft during this time, while another, together with a helicopter, patrolled at a distance. Within three or four minutes of landing the captain shut down the plane's engines and with them its air conditioning. Doors facing away from the terminal were opened for ventilation, but it became "close and warm" in the filled-to-capacity Boeing 747.

About two hours later, Flight 840's passengers were bussed to the terminal area and taken there to a makeshift waiting room. The terminal proper was sealed and patrolled by armed security personnel, though one passenger deposed that it would have been physically possible to leave the building housing their waiting room if the guards and their dogs had permitted it.

While in this waiting area, the passengers neither encountered terrorists, viewed the attack's aftermath, saw any bodies or attendant medical personnel, nor heard any sounds associated with the attack. In fact, those who deposed on the point perceived themselves to be in no danger at all. After about two hours in the holding area, Flight 840's passengers including Sakaria were bussed to the plane continuing Flight 840's service to Athens. They left the way they came in, not through the terminal proper, where the terrorist attack had taken place. At no time during Flight 840 did any passenger seek medical attention. Flight 840 continued on to Athens, arriving without further incident.

A family friend, Nick Bafitis, met Mr. Sakaria at the airport. Mr. Sakaria looked

pale, yellow, and "terrified," with black circles under his swollen eyes. He held his throat and neck and complained of thirst while recounting his experience in Rome in angry, excited tones.[1]

Mr. Sakaria travelled with Bafitis to a home in Athens. During an evening with the Bafitis family, Mr. Sakaria ate nothing because he felt as if eating would make him vomit.

The following day Bafitis drove Mr. Sakaria the seven hours from Athens to Volos, the remote village where his children resided with his wife's parents. During the trip Mr. Sakaria continued to refuse food but drank great quantities of liquids. He remained upset and broke out in tears while describing his experience in Rome.

In Volos, Mr. Sakaria sought unsuccessfully to change his return ticket to another airline before continuing on to his in-laws' house. While there, he still refused to eat and several times broke out in tears while describing events in Rome. He retired early, and the following morning Mrs. Sakaria's parents found Mr. Sakaria dead in his bed. An autopsy identified the cause of death as acute myocardial infarction or, in layman's terms, a major heart attack.[2] The Sakarias then brought this federal diversity action, alleging state law survival and wrongful death claims against TWA. Two theories were advanced. First, the Sakarias alleged

that TWA had breached a contract with Sakaria to fly him from New York to Athens nonstop. Had it not done so, it was alleged, he never would have experienced the trauma caused him by Flight 840's landing in Rome. Second, the Sakarias alleged that TWA negligently had breached the duty of care it owed Sakaria by permitting Flight 840 to stop in Rome despite TWA's awareness that a terrorist act had occurred there.[3]

In its answer, TWA denied it had contracted to fly Mr. Sakaria to Athens nonstop and denied any negligence. It also set up the Warsaw Convention,[4] as modified by the Montreal Agreement,[5] as an affirmative defense limiting its liability.

Following discovery, TWA sought summary judgment on all claims, contending that the causation element essential to each was unsupported by any admissible evidence because Mr. Sakaria's statements to Bafitis were inadmissible hearsay and the Sakarias' medical expert predicated his essential causation opinion on that hearsay. In addition, TWA submitted the deposition of a neurosurgeon, Spiridon Koulouris, who had examined Mr. Sakaria over the course of several years following a 1978 automobile accident that concededly had impaired his memory and left him permanently disabled from his job as an econometrician. Koulouris deposed that Mr. Sakaria heard nonexistent noises and was

---

1. The district court refused to consider the substance of these statements, as recounted in an affidavit executed by Bafitis, because it concluded that the statements were inadmissible hearsay. In the excluded portion of the statements allegedly made to Bafitis, Mr. Sakaria described "the shooting" and spoke of "seeing bodies and blood" when he went "upstairs to go to the bathroom."

2. The district court refused to consider the deposition testimony on causation of a cardiologist, Dr. Brandis Marsh, retained by Mrs. Sakaria in related insurance litigation because that testimony was based on the hearsay the court already had excluded concerning Mr. Sakaria's experience in Rome. Marsh opined that if Mr. Sakaria had been forced to spend an hour and a half on a closed plane without electricity before being exposed to graphic evidence of the carnage caused by the terrorist attack, his heart attack could probably be said to have been "provoked by the circumstances" of Flight 840. He renounced that conclusion when presented with a scenario

in which Mr. Sakaria neither saw the aftermath of the attack nor was exposed to a "stifling environment" on the plane. J.A. 616–620.

3. The negligence theory later firmed up as an allegation that TWA failed to comply with federal aircraft fueling requirements that would have given Flight 840 sufficient fuel to avoid landing in Rome.

4. Convention for the Unification of Certain Rules Relating to International Transportation by Air, *done* at Warsaw, Oct. 12, 1929, 49 Stat. 3000, T.S. No. 876, 137 L.N.T.S. 11, *reprinted at* 49 U.S.C. app. § 1502 note (1988).

5. Agreement Relating to Liability Limitations of the Warsaw Convention and Hague Protocol, Agreement CAB 18900, Approved by Executive Order E–23680, May 13, 1966 (Docket 17325) (1966), reprinted in Civil Aeronautics Board, Aeronautical Statutes and Related Material 515–16 (1974).

subject to hallucinations and confabulations.[6] In response to TWA's motion for summary judgment, the Sakarias submitted the Bafitis affidavit and another affidavit by Ayub Onmaya, a neurosurgeon who had examined Mr. Sakaria twice following his 1978 accident, both times before Koulouris began his four to six year interaction with Mr. Sakaria. Bafitis stated by affidavit that Mr. Sakaria's automobile accident had affected his memory but that he "had never known [Mr. Sakaria] to fabricate stories or to invent accounts of things that never happened." Onmaya opined that based on his diagnosis of Mr. Sakaria's condition "it [was] highly unlikely that Mr. Sakaria experienced delusions, hallucinations, or confabulations on the date of the [terrorist] incident" and concluded "to a reasonable degree of medical certainty" that "Mr. Sakaria's experience was based on reality."

The district court referred the case to a magistrate judge, who concluded that "[t]he overwhelming evidence in this case indicates that the events at issue did not occur as [Mrs. Sakaria] contends" and recommended that summary judgment for TWA be granted. In reaching this conclusion, the magistrate judge refused to consider the alleged statements by Mr. Sakaria recounted in the Bafitis affidavit, concluding that they were "uncorroborated hearsay ... bearing no guarantees of trustworthiness." She also denied the parties a hearing and recommended rejection of the Sakarias' request for additional discovery and leave to amend their complaint to state expressly a cause of action under the Warsaw Convention.

The Sakarias objected to the magistrate judge's report, including its refusal to consider a Warsaw Convention claim, and requested a hearing. TWA countered their objections and opposed the hearing. The district court granted summary judgment to TWA after denying oral argument on the grounds that it "would not assist the court in understanding, or deciding, the issues presented." Essentially adopting the magistrate judge's recommendations, the court concluded that on the material facts not genuinely in issue, the Sakarias' state law wrongful death and survival claims failed as a matter of law. The specific contract breach alleged, of failure to fly non-stop to Athens, did not occur; TWA flew Mr. Sakaria exactly as scheduled, to Athens with an intermediate stop at Rome. There was no negligence in not having enough fuel to overfly Rome, because that was a scheduled stop. Furthermore, even if contract breach and/or negligence were assumed, neither, as a matter of law on the undisputed facts of record, could be found a reasonably foreseeable cause of Mr. Sakaria's death. As to the possibility of liability under the Warsaw Convention, which the magistrate judge had declined to consider because not expressly pleaded by the Sakarias, the court held that it "need not discuss" whether the claim was before it, concluding summarily that on the record before it, no such claim could be established in any event.

This appeal followed.

## II

For reasons that soon will be apparent, we need first to determine whether at the time TWA's summary judgment motion was ruled upon, the Sakarias were entitled to have it considered that their action included a Warsaw Convention claim in addition to the expressly pleaded state-law wrongful death and survival claims. As indicated, the magistrate judge declined to consider that such a claim was in the case, because the Sakarias had not expressly pleaded it, or to allow it to be added by amendment as the Sakarias sought to do if it were considered necessary. And, as indicated, the district court then essentially finessed the question, holding summarily that even if it were in the case, it failed on the merits.

Of course the claim should have been considered to be in the case at that point—either because sufficiently well-pleaded as was, or because, if it were thought needful for what-

6. "Confabulation" is the "recitation of imaginary experiences to fill gaps in memory." B. Miller & C. Keane, *Encyclopedia and Dictionary of Medicine, Nursing, and Allied Health* (3d ed. 1983).

Dr. Koulouris described it as "generating or reporting nonexistent situations, either totally nonexistent or mixed with real events."

ever reason to have it expressly pleaded, the proffered amendment should have been allowed in a proper exercise of discretion. Indeed, TWA does not contest its consideration on this appeal.

The point does not require great discussion. Maybe even before, but certainly after TWA raised the Warsaw Convention as a limitation on its liability, every purpose of notice pleading had been served.[7] If an express pleading of the claim was then thought necessary for *res judicata* or other purposes, it should have been allowed as a matter of course. At that point, TWA had itself invoked the Convention (though for damage limitation purposes) signalling that it was prepared to defend against such a claim. It therefore was obvious that no prejudice to TWA or delay in the process would result. In those circumstances, the command of *Fed. R.Civ.P.* 15(a) that leave to amend should be "freely given when justice so requires" should have been followed—if that were thought a necessary condition to having the claim considered on the merits.

We therefore hold that the Sakarias were entitled to have their proffered Warsaw Convention claim considered on the merits in the district court's ruling on TWA's motion for summary judgment. This means in turn that, reviewing that ruling *de novo*, we too must consider the claim on its merits.

### III

Before getting to the merits of any of the claims, however, we have to deal with one other procedural point.

The Sakarias contend that vacatur and remand is required because of the refusal of both the magistrate judge and the district judge to afford them an opportunity for oral

hearing on TWA's motion for summary judgment. This, they contend, was an abuse of discretion requiring vacatur and remand. We disagree.

While the importance of oral advocacy in general must of course be recognized, it is our rule that there is "no absolute requirement that a ruling on a motion for summary judgment be preceded by a[n oral] hearing." *Langham–Hill Petroleum, Inc. v. Southern Fuels Co.*, 813 F.2d 1327, 1330 (4th Cir.1987). The Sakarias contend, however, that in some situations the complexity of issues may be such that the refusal to afford an oral hearing is an abuse of discretion, and that this is such a case. They rely principally on *In re Paoli R.R. Yard PCB Litigation*, 916 F.2d 829, 854 (3d Cir.1990), in which the Third Circuit found such an abuse. We may accept that such cases can exist, and that *Paoli* properly identified one, but we don't believe this one qualifies.

*Paoli* was a thirty-eight plaintiff mass tort action against a railroad alleging multiple-party injuries from PCB exposure; this is essentially a two-party lawsuit in which damages are sought for the death of one person. The need for oral testimony in *Paoli* was thought to arise from the complexity and volume of expert testimony related to the levels of toxic exposure involved and to the causal link between that exposure and the many plaintiffs' injuries. The resulting difficulty was compounded by discovery limitations that curtailed plaintiffs' ability to challenge the critical opinions of defense experts except by written and oral advocacy.

This case has neither of those critical features. The Sakarias had had ample opportunity to cross-examine for the record all of

---

**7.** The confusion here undoubtedly stemmed—though it need not have, *see Fed.R.Civ.P.* 8(e)(2) (alternative, inconsistent claims and defenses allowable)—from the still not fully certain interplay between state-law claims and the federal claim created by the Warsaw Convention respecting harms occurring during international air transportation. See Part IV, *supra*. The Sakarias' failure to proceed initially, as they could have, on expressly pleaded alternative claims created a tactical problem for TWA, which it properly resolved by raising the Warsaw Convention's limitation on liability as an alternative de-

fense available if that not yet expressly pleaded claim rather than any of the state-law claims were to be established. Primary fault for the resulting confusion can thus rightly be laid to the Sakarias, who only belatedly sought to get on the alternative track. That, however, should not have prevented the modest, nonprejudicial retrieval of the situation that they then sought, *see Fed.R.Civ.P.* 1, a point the district court apparently recognized by addressing the claim, though summarily, on an "assuming-it's-in-the-case" basis.

TWA's causation experts. They'd not been prevented from developing their own expert opinion evidence on causation, nor such lay testimony by fellow-passengers as they desired. They'd had ample opportunity to resist summary judgment by written arguments.

The resulting summary judgment record was thus a fairly developed and argued one. It could not have been added to substantively by oral argument. And while, as probably is always the case to some extent, oral advocacy may have been able to present the Sakarias' position somewhat more forcefully, the issues raised were not—unlike those in *Paoli*—such that they could only fairly be presented by oral argument.

We therefore conclude that the district court did not abuse its discretion in declining to conduct an oral hearing before ruling on TWA's motion for summary judgment.

## IV

■ Turning to the merits, we first consider the Sakarias' Warsaw Convention claim. Article 17 of the Warsaw Convention provides that in respect of international air transportation

[t]he carrier is liable for damage sustained in the event of the death or wounding of a passenger or any other bodily injury suffered by a passenger, if the accident which caused the damage so sustained took place on board the aircraft or in the course of any of the operations of embarking or disembarking.

It is now settled that this treaty provision provides an independent federal cause of action in situations where it applies. *Benjamins v. British European Airways*, 572 F.2d 913, 919 (2d Cir.1978), *cert. denied*, 439 U.S. 1114, 99 S.Ct. 1016, 59 L.Ed.2d 72 (1979). As do federal common law tort claims generally, it survives the death of the victim despite the absence of a specific statutory command to that effect. *In re Mexico City Aircrash of October 31, 1979*, 708 F.2d 400, 415 (9th Cir.1983); *see Moragne v. States Marine Lines, Inc.*, 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970).

There is then the question of the nature of the claim and of its applicability to the facts of this case, as developed in the summary judgment record. As interpreted by the courts, the claim created is one of strict, but limited, liability, the one having been traded off for the other in the treaty negotiation process. *See In re Air Disaster at Lockerbie, Scotland*, 928 F.2d 1267, 1271 (2d Cir.) *cert. denied*, —— U.S. ——, 112 S.Ct. 331, 116 L.Ed.2d 272 (1991). In addition to the international flight predicate, the essential elements of the claim are thus (1) an "accident," that (2) "took place on board the aircraft or in the course of any of the operations of embarking or disembarking," and that (3) "caused" the death, wounding or other bodily injury of a passenger. By judicial interpretation, "accident" refers to the cause of injury rather than the injury itself, and consists of "an unexpected or unusual event or happening that is external to the passenger," *Air France v. Saks*, 470 U.S. 392, 405, 105 S.Ct. 1338, 1345, 84 L.Ed.2d 289 (1984), a definition that excludes injuries resulting from "a passenger's own internal reaction to the usual, normal, and expected operation of aircraft." *Id.* at 406, 105 S.Ct. at 1345.

■ To some extent, each of these elements of the claim is the subject of dispute on this appeal. As to the first—whether an "accident" occurred—the Sakarias identify two events that they contend either independently or in combination qualify: Mr. Sakaria's hour-and-a-half to two hour confinement in the unairconditioned aircraft while under the emotional stress of knowing that it was caused by "an altercation" in the terminal requiring security precautions and his later exposure to the sight of the covered bodies of persons killed in the terrorist attack.

As to the first of these events, the prolonged confinement in the aircraft, TWA contends that as a matter of law it is not the type of unusual or unexpected event or happening that is considered an "accident" within the meaning of Article 17 of the Warsaw Convention. As to the second, the alleged sighting of the terrorist attack's aftermath, TWA has two basic contentions: the proffered evidence of its occurrence was properly disregarded as inadmissible hearsay, and in

any event was too shaky and questionable to raise a genuine issue of fact, and, alternatively, if the sighting did occur as alleged, it could only have done so by conduct of Sakaria that took him outside the process of "disembarkation," hence outside the temporal/spatial "on-board, etc." limitation imposed by the claim's second element.

As to the causation element, the parties essentially dispute the admissibility, and, even if admissible, adequacy of the Sakarias' causation evidence to raise a genuine issue. TWA says that the only such evidence proffered other than that of the temporal sequence of flight and death, was that of Dr. Marsh, whose causation opinion concededly was based on the rightly excluded evidence of Sakaria's alleged account to Bafitis, hence was inadequate to raise a genuine issue. On this basis, TWA contends (by necessary implication) that even if either or both the events relied on by the Sakarias as Warsaw Convention "accidents" qualify as such, the inadequacy of the proffered evidence of proximate causation between those "accidents" and Sakaria's death entitled it to judgment as a matter of law.

These conflicting contentions raise legal issues concerning the Warsaw Convention's coverage that are ones of first impression in this circuit. Regrettably, as indicated, the magistrate judge did not address them at all, and the district court, only contingently and cursorily.[8] Though they properly should have been more fully considered by the district court whose judgment of dismissal we review, our review is de novo, *Atlas Machine and Iron Works, Inc. v. Bethlehem Steel Corp.*, 986 F.2d 709, 712 (4th Cir.1993), hence

not limited to the scope of that court's consideration.

On the basis of our independent review of the summary judgment record and our consideration of the written and oral arguments of counsel on this appeal, we have concluded that the Warsaw Convention claim was properly dismissed by summary judgment.

First off, we think the district court properly declined to consider as part of the summary judgment record the substance of the statements ascribed to Mr. Sakaria in the Bafitis affidavit. To be entitled to consideration on summary judgment motions, facts set forth in affidavits must be "such ... as would be admissible in evidence." *Fed. R.Civ.P.* 56(e). The substance of the Sakaria account in the Bafitis affidavit was of course hearsay whose admission obviously would have affected a substantial right of TWA, *see Fed.R.Evid.* 103(a), so that its admissibility as evidence depended upon bringing it within one of the specific or the residual exception to the hearsay rule. On this appeal, the Sakarias assign as error the district court's refusal to find this proffered evidence admissible under the "excited utterance" exception of Fed.R.Evid. 803(2).[9] We find no error in that ruling.

Rule 803(2) excepts from the hearsay rule statements relating to a startling event or condition while the declarant was under the stress of excitement caused by the event or condition. The theory of course is that the state of excitement prompted by such events sufficiently guarantees unreflective spontaneity in hearsay statements describing the events to supply the internal trustworthiness that cross-examination is not available to

**8.** While asserting that there were "several" bases for concluding that any Warsaw Convention claim in the case could not be established, the court expressly identified only one as "obvious" and sufficient. This, apparently, was that without benefit of Sakaria's alleged accounts of the events in Rome, it could not be established that he was "injured on board the airplane or in the course of any operation of embarking or disembarking," which the court understood to be required by the Convention. J.A. 18. It's not possible to tell from this just what deficiency was being identified. The requirement is not that "injury" shall have occurred "on board ... or in the course ...", but that the causal "accident" shall have occurred then and there. Whether

this involved misapprehension on this critical point is not clear but is irrelevant to our de novo review.

**9.** The Sakarias also suggested that there might be "other exceptions" that warranted admission—presumably the "present sense impression" exception of Rule 803(1) and the "residual exception" of Rule 803(24). But they have only argued specifically for the "excited utterance" exception on this appeal, and although the district court ruled out both those other exceptions, we don't discuss them beyond noting that if the "excited utterance" exception doesn't apply here, neither would those others.

test. *See generally* McCormick on Evidence, § 272 (4th ed. 1992). There are any number of reasons why this generally valid theory of trustworthiness by virtue of excited spontaneity may be found unsupported in particular cases.[10] We think several were present here that warranted refusal to apply the exception. Foremost was the evidence before the court—uncontradicted in its essence, though challenged in some details—that since a mentally incapacitating illness in 1978, Mr. Sakaria had been subject to hallucinatory misperceptions of reality in precisely the sort of situation that developed here. His wife, for example, conceded in deposition that upon viewing television reports of the Iran–Iraq war, he imagined himself to be threatened by the far away events being depicted. J.A. 192–197. The possibility that hallucination rather than spontaneity may have driven Sakaria's alleged account of events in Rome, no matter how excitedly given, was strengthened by other indications in the record. Despite full opportunity to develop corroborating evidence of Sakaria's having seen any of the immediate results of the terrorist attack in the Rome airport, none was presented. From the absence of any such obviously vital corroboration of Sakaria's alleged account, the district court was entitled to assume that no other passenger had seen any such thing; that Sakaria was not seen by any other passenger to have left the waiting room in which all were told to stay; and that Sakaria told no one at that time—when his excitement presumably would have been at its height—about having had any such experience. Confronted with this situation, the district court was amply justified in declining to consider this highly questionable hearsay account going to so critical an issue but lacking a shred of corroboration of its trustworthiness.

■ With this account of the sighting of attack victims out of the picture as an "accident" causing Sakaria's death,[11] we are left with the period of uncomfortable confinement in the aircraft by one knowing that it was caused by an "altercation" that justified visible security precautions. Whether this "event or happening" considered in isolation could be held as a matter of law to be so "unusual or unexpected" in international air transportation as to constitute an "accident" under the *Saks* definition raises interesting questions by no means easy to resolve.[12] We need not make the effort, for we hold that even if it were, the summary judgment record does not present a genuine issue of material fact as to the required link of causation between that event and Sakaria's death. As earlier indicated, the only evidence proffered in support of the required causation, aside from the raw temporal sequence of the two events, was the deposition testimony of the Sakarias' medical expert, Marsh. His original opinion that the totality of the event as allegedly recounted by Sakaria to Bafitis probably provoked the heart attack was effectively renounced once the possible cause was limited to the prolonged wait in the aircraft. J.A. 616–620. Maybe even in its original form, and certainly in its final, Marsh's testimony on this issue would not suffice under our standard to support the requisite finding of causation, as to which the Sakarias of course had the burden of proof. In a long line of decisions in this circuit, we have emphasized that proof of causation must be such as to suggest "probability" rather than mere "possibility," precisely to guard

10. Mainly because a too-long lapse of time is thought to have permitted excitement to die allowing reflection or fabrication to take over. *See, e.g., Morgan v. Foretich,* 846 F.2d 941 (4th Cir.1988). But even where deliberate fabrication is not likely—as certainly is the case here—there may well be other reasons to find spontaneity, even if maintained in the interval, not a sufficient safeguard against *inaccuracy.*

11. This avoids any necessity to deal with TWA's alternative contention that even if the account of this event were considered, it could not be found an "accident" because, by Sakaria's own purported account, it occurred while he wasn't "embarking or disembarking" but had taken himself out of TWA's control. *See Day v. TWA,* 528 F.2d 31 (2d Cir.1976) (carrier control over passenger a factor in assessing whether passenger engaged in process of embarking or disembarking).

12. Among them: whether in assessing the "usual or unusual" character of this "event," the terrorist attack, which didn't "take place on board," should nevertheless be considered a part of that event; whether, if not, the prolonged wait itself was so "unusual or unexpected" an event (whatever its immediate cause) in contemporary air travel, as to constitute an "accident" under *Saks.*

against raw speculation by the fact-finder. *Lovelace v. Sherwin–Williams Co.,* 681 F.2d 230, 241–42 (4th Cir.1982) (motivation in ADEA case); *Wratchford v. S.J. Groves & Sons, Co.,* 405 F.2d 1061, 1066 (4th Cir.1969) (cause of personal injury); *Ford Motor Co. v. McDavid,* 259 F.2d 261, 266 (4th Cir.1958) (cause in products liability case); *Ralston Purina Co. v. Edmunds,* 241 F.2d 164, 168 (4th Cir.1957) (same). Where, as here, resolution of the causation issue is dependent upon expert opinion testimony, it must meet that standard, and Dr. Marsh's revised opinion, when based upon the only admissible evidence of "accident" in the summary judgment record, *see Newman v. Hy–Way Heat Systems, Inc.,* 789 F.2d 269, 270 (4th Cir. 1986), does not do so.

Accordingly, we affirm dismissal of the Warsaw Convention claim by summary judgment.

## V

Turning to the state-law survival and wrongful death claims, we first note our assumption, without deciding the issue, that they are not preempted by the Warsaw Convention claim. While it has been held that where the Warsaw Convention claim provides a remedy, the remedy is exclusive of any others, *see In re Air Disaster at Lockerbie, Scotland,* 928 F.2d 1267, 1275 (2d Cir.) *cert. denied,* — U.S. —, 112 S.Ct. 331, 116 L.Ed.2d 272 (1991), the Supreme Court has reserved decision on whether the scope of exclusivity might be even wider than that of liability. *See Saks v. Air France,* 470 U.S. at 408, 105 S.Ct. at 1346. As indicated, without deciding the issue, we can assume for purposes of this case that, at least where the Warsaw Convention claim has been found not available, parallel state-law claims such as those here in issue are not preempted.

Addressing those claims here, we affirm their dismissals by summary judgment. The reasons are plain, as given by the district court. As to the negligence theory advanced under both the wrongful death and survival claims, even if TWA were negligent somehow in failing to provide enough fuel to fly past Rome, the evidence would not support a finding of proximate causation between that negligence and Sakaria's death. The evidence founders not only for the same reason that the Warsaw Convention claim foundered for insufficiency of proof of causation between the Rome lay-over events and Sakaria's death, but for additional infirmities related to the even more attenuated link back to TWA's alleged act of culpability in fueling the flight.

The same infirmity defeats the contract claim,[13] though here through the ancient parallel foreseeability principle of *Hadley v. Baxendale,* 9 Ex. 341, 156 Eng.Rep. 145 (1854). Even if there were a contract breach in stopping over in Rome, the risk that Mr. Sakaria's death would somehow be caused by that event in conjunction with a terrorist attack at that very time is obviously far too remote to allow recovery in contract.

*AFFIRMED.*

---

13. There could be another infirmity in the "contract" theory in the wrongful death claim. The general rule is that breach of contract claims don't lie under wrongful death statutes, that those statutes contemplate only tort as a basis for liability. *See* Prosser and Keeton on *Torts,* § 127. We need not address whether that is the rule in Maryland in view of our disposition on other grounds.