TEXTRON INC., Acting By and Through its HOMELITE DIVISION, Plaintiff,

v.

BARBER–COLMAN COMPANY, Burlington Industries, Inc., A.B. Carter, Inc., Hoechst Celanese Corporation, and Dixie Yarns, Inc., Defendants.

No. 3:93–CV–411–P.

United States District Court,
W.D. North Carolina,
Charlotte Division.

Sept. 29, 1995.

Christopher G. Browning, Jr., Hunton & Williams, Raleigh, NC, Richard C. Belthoff, Jr., Grier and Grier, P.A., Charlotte, NC, Joseph C. Kearfott, Hunton & Williams, Richmond, VA, for Textron Inc., Acting by and Through its Homelite Division.

Benne C. Hutson, Irving M. Brenner, Smith, Helms, Mulliss & Moore, Charlotte, NC, for Barber–Colman Co.

Robert W. Fuller, III, Robinson, Bradshaw & Hinson, Charlotte, NC, for Burlington Industries, Inc.

Stephen R. Berlin, J. Stephen Shi, Petree Stockton, Winston–Salem, NC, for A.B. Carter, Inc.

Thomas N. Griffin, III, Kevin A. Dunlap, Parker, Poe, Adams & Bernstein, Charlotte, NC, for Hoechst Celanese.

Bradford A. De Vore, Womble, Carlyle, Sandridge & Rice, Charlotte, NC, for Parkdale Mills, Inc.

Amos C. Dawson, III, Maupin Taylor Ellis & Adams, Raleigh, NC, Hugh J. Moore, Jr., Witt, Gaither & Whitaker, P.C., Chattanooga, TN, for Dixie Yarns, Inc.

## MEMORANDUM OF DECISION AND ORDER

ROBERT D. POTTER, Senior District Judge.

**THIS MATTER** is before the Court on Motion by Defendant Burlington Industries Inc. ("Burlington") for Summary Judgment, filed December 2, 1994, (document # 68). For the reasons stated herein, that motion will be granted.

An investigation by the United States Environmental Protection Agency ("EPA") and the North Carolina Division of Solid Waste Management ("DSW") confirmed the presence and threatened release of hazardous substances at the so-called "Harwell Road site." That investigation also indicated that Textron Inc. ("Textron") was a principal generator of those hazardous wastes. As a result, the EPA issued an administrative order, pursuant to Section 106 of CERCLA, 42 U.S.C. § 9606, that required Textron to remove the hazardous substances from the site. Textron voluntarily complied with the EPA's order. Later, Textron filed this contribution action to recover some of those costs from the Defendants in this action.

## I. BACKGROUND.

In the late 1940's, R.A. McKee began doing business in Gastonia, North Carolina. His business was waste disposal. In connection with that business, he purchased the 10.5 acre property that abuts Harwell and Beatty Roads in 1967. He used that property to dispose of waste picked up from his customers, and that property is now referred to as the Harwell Road site.[1]

McKee did business with a number of industrial companies in Gaston County. He both constructed and maintained septic systems and removed sludge from their tanks. At some companies his practice was to dispose of the sludge removed from their tanks on their own property. With respect to other companies, however, he removed waste from their holding and treatment tanks by pumping sludge from those tanks into his tanker truck. He then transported that

---

1. Like the parties, the Court refers to the Harwell Road site as such; but in his deposition testimo-

ny McKee refers to the property as the Beatty Road site.

sludge and wastewater to the Harwell Road site and disposed of the waste there. The Harwell Road site was permitted for the disposal of sludge by the Gaston County Health Department.

McKee began using the Harwell Road property to dispose of septic sludge as soon as he purchased it in 1967. His practice was to dig trenches in the ground approximately 30″ wide by 6′ deep and anywhere from 12′ to 20′ long. He disposed of sludge by emptying his 2000 gallon tank truck into those trenches, allowing the sludge and wastewater to seep into the ground. Later, McKee would cover the sludge with dirt. McKee conducted his operations this way until about 1978 when he sold his business.

Ultimately, an investigation by the EPA and the North Carolina DSW indicated the presence and threatened release of hazardous substances at the Harwell Road site. That investigation also indicated that Textron was a principal generator of those hazardous wastes. Therefore, in 1989 Textron received an administrative order from the EPA, later revised in May of 1990, pursuant to § 106(a) of CERCLA, 42 U.S.C. § 9606(a). The revised order stated that the migration of hazardous substances from the site constituted an actual or threatened release as defined in Section 101(22) of CERCLA. The order required Textron to remove the hazardous substances from the Harwell Road site as well as conducting other operations designed to render the site safe.

Textron elected to voluntarily comply with the EPA's order. It thereafter performed a variety of tasks including the installation of monitoring wells, hydraulic conductivity testing, metal detector surveys, as well as the sampling and analysis of soils, surface water, groundwater and septic pits. Pursuant to the EPA's order, Textron also excavated, removed, sampled, and disposed of buried drums and their contents off-site, and performed other work required by the EPA. By virtue of the EPA's investigation and Textron's activities many hazardous substances have been detected at the Harwell Road site including zinc, copper, phenol, the BTEX compounds (benzene, toluene, ethylbenzene and xylene), and a variety of other heavy metals, and volatile and semivolatile compounds.

Later, Textron filed this action to recover some of the costs incurred to comply with the EPA's order from the Defendants in this action. According to Textron, the Defendants also generated some of the hazardous substances found at the Harwell Road site, and therefore, they are liable for some share of the costs Textron incurred to remove those wastes as well as any future costs incurred by Textron to comply with EPA mandates.

All of the Defendants have moved for summary judgment. In large part, the motions for summary judgment before the Court arise from the passage of time. McKee hauled waste generated by his customers to the Harwell Road site between 1967 and 1978 and he was 85 years old at the time of his deposition on May 19, 1994. Although he had kept the books for his business, those records were destroyed in a fire that occurred around 1979 or 1980. So he is the only source of information concerning his waste-hauling business. Similarly, the passage of time has limited the documentary and other evidence about the Defendants' operations available through discovery. Textron's efforts to discover the chemicals used in connection with the Defendants' processes of production has met with little results. Thus, the documentary evidence upon which Textron relies is fairly slim. And ultimately, it is this sparsity of evidence that drives all of the motions for summary judgment now before the Court. In one way or another, all of the Defendants assert that Textron has failed to produce evidence from which a reasonable person could conclude that their processes of production generated hazardous substances and/or that those hazardous substances were hauled by McKee to the Harwell Road site.

## II. *ANALYSIS.*

In this case, Textron seeks contribution from the Defendants for their proportionate share of response costs etc. incurred by Textron in connection with its remediation of the Harwell Road site. As previously noted by this Court, according to the plain language of § 113 of CERCLA, 42 U.S.C.

§ 9613(f)(1), Textron's contribution action in this case arise under § 107 of CERCLA, 42 U.S.C. § 9607. That section imposes strict liability on certain classes of persons described therein, and does not require any showing that the specific hazardous wastes generated by a given defendant caused the release of hazardous substances that results in remedial action. *U.S. v. Monsanto Co.*, 858 F.2d 160, 167–68 (4th Cir.1988). Liability under CERCLA is joint and several unless a defendant can show that damages are divisible. *See e.g. Monsanto, 858 F.2d at 171 & n. 3; U.S. v. Alcan Aluminum Corp.*, 964 F.2d 252, 267–71 (3rd. Cir.1992) (discussing cases).

Taken together § 9613(f)(1) and § 9613(g)(3) confirm that Textron has a right to contribution from the Defendants if it can show that the Defendants are liable for response costs etc. under § 9607. In pertinent part that section provides:

§ 9607

(a) **Covered persons; scope**

       \*     \*     \*     \*     \*     \*

(3) any person who by contract, agreement, or otherwise arranged for disposal ... of hazardous substances owned or possessed by such person, by any other party or entity, at any facility owned or operated by another party or entity and containing such hazardous substances, shall be liable for

       \*     \*     \*     \*     \*     \*

(B) any other necessary costs of response incurred by any other person consistent with the national contingency plan;

42 U.S.C. § 9607(a). In this case, Textron must show that the Defendants arranged with McKee for the disposal of wastes, and those wastes are at the Harwell Road site.

The Defendants have moved for summary judgment pursuant to Fed.R.Civ.Proc. 56, alleging that Textron has failed to produce evidence from which a reasonable person could conclude that any Defendant generated hazardous substances that were disposed of at the Harwell Road site. "Under Rule 56(c), summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 321, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) *citing* Fed.R.Civ.Proc. 56(c). However, Rule 56 does not require the moving party to produce evidence negating an opponent's claim. *Celotex Corp. v. Catrett,* 477 U.S. at 323, 106 S.Ct. at 2553. That is, "under *Celotex,* 'the moving party on a summary judgment motion need not produce evidence, but simply can argue that there is an absence of evidence by which the nonmovant can prove his case.'" *Cray Communications v. Novatel Cmptr. Systems, Inc.,* 33 F.3d 390, 393–94 (4th Cir.1994) (*citing* 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2720 at 10). This is because "[o]ne of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses ..." *Celotex,* 477 U.S. at 323–24, 106 S.Ct. at 2553.

"Once a defendant makes a properly supported motion for summary judgment, the burden shifts to the plaintiff to set forth specific facts showing that there is a genuine issue for trial." *Sylvia Development Corp. v. Calvert County, Md.,* 48 F.3d 810, 817 (4th Cir.1995) *citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2511. Put another way, there must be a *genuine* issue for trial. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512. "The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict ..." *Id.* Where, as here, a party moves for summary judgment

based on lack of proof as to material facts, "the judge must ask himself ... whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512.

As with any summary judgment motion, "the court must draw any permissible inference from the underlying facts established in the record in the light most favorable to the non-moving party." *Austin v. Clark Equipment Co.*, 48 F.3d 833, 835 (1995). But in order for an inference to be *permissible* it must be *reasonable*, and "[w]hether an inference is reasonable cannot be decided in a vacuum; it must be considered in 'light of the competing inferences' to the contrary." *Sylvia*, 48 F.3d at 818, *citing Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 588, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). As the Fourth Circuit has stated:

> [I]t is the province of the jury to resolve conflicting inferences from circumstantial evidence. Permissible inferences must still be within the range of reasonable probability, however, and it is the duty of the court to withdraw the case from the jury when the necessary inference is so tenuous that it rests merely upon speculation and conjecture.

*Sylvia*, 48 F.3d at 818, *citing Ford Motor Co. v. McDavid*, 259 F.2d 261, 266 (1958) (brackets in original). In short, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 588, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

■ In this case, Textron has relied heavily on the testimony of its expert and the Defendants have also albeit to a lesser extent. The admissibility of expert testimony in federal court is governed by Fed.R.Evid. 702. That rule provides:

> If *scientific, technical, or other specialized knowledge* will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Fed.R.Evid. 702. Recently, in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, —— U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Supreme Court explained that portion of the rule relating to expert "knowledge" by stating, "the word 'knowledge' connotes more than subjective belief or unsupported speculation. The term applies to any body of known facts or any body of ideas inferred from such facts or accepted as truths on good grounds." *Id.* at ——, 113 S.Ct. at 2795. Under the Federal Rules, the trial judge must ensure that any and all expert testimony is not only relevant but also reliable. *Daubert*, —— U.S. at ——, 113 S.Ct. at 2786. Further, not every opinion offered by an expert is an expert opinion. Rule 702 "does not afford the expert unlimited license to testify ... without first relating that testimony to some 'specialized knowledge' on the expert's part...." *U.S. v. Johnson*, 54 F.3d 1150, 1157 (4th Cir.1995). Put another way, an expert's opinion "must be an 'expert' opinion (that is, an opinion informed by the witness' expertise) rather than simply an opinion broached by a purported expert." *U.S. v. Benson*, 941 F.2d 598, 604 (7th Cir.1991).

■ The Fourth Circuit has recognized that on a motion for summary judgment, the court's screening role under Fed.R.Civ.Proc. 56, dovetails with the court's "gatekeeper" function as to expert testimony, *see Daubert*, —— U.S. at —— – ——, 113 S.Ct. at 2798–99, and "[t]he credibility of competing experts is a question for the jury only if the party with the burden of proof has offered enough evidence to sustain a verdict in its favor." *Alevromagiros v. Hechinger Co.*, 993 F.2d 417, 421 (4th Cir.1993). And just as "[a]n expert's opinion should be excluded when it is based on assumptions which are speculative and are not supported by the record," *Tyger Const. Co. Inc. v. Pensacola Const. Co.*, 29 F.3d 137, 142 (4th Cir.1994), summary judgment should be granted where expert opinion suggests merely a possibility, as opposed to a probability, "precisely to guard against raw speculation by the fact-finder." *Sakaria v. Trans World Airlines*, 8 F.3d 164, 172–73 (4th Cir.1993). The Fourth Circuit has indicated that an expert's subjective opinion is insufficient to withstand a motion for sum-

mary judgment because "we are unprepared to agree that 'it is so if an expert says it is so.'" *Alevromagiros,* 993 F.2d at 421 (citations omitted); *see also Daubert,* ——— U.S. at ———–———, 113 S.Ct. at 2795 (expert knowledge must be more than subjective belief or unsupported speculation). Thus, the inferences a court is asked to draw by expert testimony must be reasonable in light of competing inferences. *See Comprehensive Technologies v. Software Artisans,* 3 F.3d 730, 737 (4th Cir.1993); *see also Anderson,* 477 U.S. at 251–52, 106 S.Ct. at 2512 (standard for summary judgment and directed verdict are the same).

Seen in this light, it is apparent that the experts of both parties are woefully overextended. *Cf. Hardin v. Ski Venture, Inc.,* 50 F.3d 1291, 1296 (4th Cir.1995) (regarding plaintiff's effort to "stretch the expert's testimony beyond its set boundaries.") The vast majority of the "expert" testimony offered to the Court concerns nothing more than inferences to be drawn from the record, or some arguably lay opinion testimony based on experience that is not "expert" in any meaningful sense. Not only have these "experts" testified as to ordinary inferences to be drawn from the evidence of record, some experts have seen fit to opine as to the meaning of CERCLA provisions. In fact, the amount of testimony as to which the expertise of the parties' experts is truly relevant is remarkably slim—almost non-existent.

Burlington has moved for summary judgment asserting that Textron has failed to produce evidence from which a reasonable person could conclude that it generated hazardous substances that were taken to the Harwell Road site by McKee. The record shows that Burlington spins yarn and conducts cotton and man-made fiber operations at its plant in Ranlo, North Carolina. During the 1968–77 period, the wastewater generated by processes at the Ranlo plant included a water-washable tint, the chemical composition of which is unknown. Sanitary wastewater from the plant and some 100 "mill village" residences was discharged to a wastewater treatment system. This system consisted of an Imhoff tank, a dosing tank, two sand filters, and a sludge bed. The parties dispute whether the discharge from boilers and air conditioners and the tint wastes were routed to the sanitary sewer and Burlington's waste system in 1972 or later.

## A. *Evidence that McKee Hauled Burlington's Waste.*

■ Burlington claims that Textron has not produced evidence from which a reasonable person could find that McKee hauled waste from its plant to the Harwell Road site. According to Burlington, McKee's testimony that he did so is insufficient because at one point in his deposition he stated that he could not recall hauling the waste during the 1970's. To buttress this claim, Burlington relies on the testimony of Mr. Duckworth, a former employee of Burlington, who testified that McKee did not haul waste from Burlington's plant during the 1970's. According to Duckworth, McKee pumped the contents of its wastewater tank onto the company's property.

McKee's testimony is sufficient to withstand the motion for summary judgment on the issue of whether some of Burlington's waste was disposed of at the Harwell Road site. Burlington has seized upon an isolated portion of McKee's testimony where he stated that he could not be absolutely certain whether he worked for Burlington during the period at issue. In the Court's view, that testimony is better viewed as an admission that he does not have total recall of events that occurred during the 1970's. Notwithstanding that admission, the bulk of McKee's testimony is remarkably detailed, and conveys his conviction that he did work for Burlington during the period at issue. He recalls having worked for Burlington on probably two occasions during the period in question; and there are two receipts which confirm that he did work for Burlington in 1975 and 1976. He also recalls pumping the contents of Burlington's tank onto Burlington's property, as Duckworth remembers. However, his testimony also indicates that he first brought some of the tank's contents over to the Harwell Road site; he only decided to pump the wastewater onto Burlington's land after he realized that the tank was

refilling while he was en route to and from the Harwell Road site. Further, McKee testified, in detail, concerning his removal of the "crust" from Burlington's tank. When read as a whole, McKee's testimony indicates that he certainly believes that he removed wastewater and sludge from Burlington's plant and took it to the Harwell Road site during the relevant period.[2] To the extent Duckworth's recollection is different, and perhaps, more certain, that question would be for trial.

## B. *Evidence that Burlington's waste contained Hazardous Substances.*

### 1. *Heavy Metals.*

■ In support of its contention that wastewater generated by Burlington's plant contained heavy metals, Textron relies principally upon a 1974 EPA report which indicates that Burlington's wastewater contained copper and zinc. Of course, the EPA's test was taken in 1974, whereas the records available (disbursement records) and testimony indicate that McKee worked for Burlington in 1975 and 1976.[3] In order to link the 1974 results with the work done in 1975 and 1976, Textron's expert, Dr. Koon ("Koon"), has offered two related opinions. First, he has opined that if the heavy metals zinc and copper were detected in the wastewater system in 1974, then it is reasonable to assume that they were present in the tank. He states that heavy metals are "adsorbed" into sludge so that they do not pass through the tank; therefore it is reasonable to infer that the heavy metals would be in the tank at almost any given time and quite apart from what was passing through the system at least after 1974. But this is mere speculation. The record shows that McKee did work for Burlington in 1975 and 1976. Neither Textron nor Koon have any idea whether the sludge handled by McKee in 1975 and 1976

has any relationship with the contents of the tank in 1974. Indeed, Textron's expert has told the Court that it would be normal for Burlington to have its sludge removed once a year.

Textron addresses this problem by offering Koon's opinion that heavy metals were present in Burlington's wastewater system throughout the period in question. Koon asserts that given certain waste-producing operations at the plant, metal-working and cooling water discharge, it is reasonable to infer that heavy metals would be present in Burlington's wastewater tank "probably all of the time." But Koon has no factual basis concerning how metal-working operations performed at the Burlington plant contributed heavy metals to the wastewater stream. His opinion reflects this absence of foundation. For example, in his report Koon opines that cutting oils "could have been discharged to the sanitary sewer" or that operations in the metal shop "could produce heavy metals" that "could be introduced into plant wastewaters." But absent some specific facts confirming that such wastes were generated and linking these wastes to the wastewater system, his "expert opinion" on this issue is precisely the sort of conjecture that is *not* sufficient to withstand a motion for summary judgement. *See Alevromagiros,* 993 F.2d at 421 ("[t]he credibility of competing experts is a question for the jury only if the party with the burden of proof has offered enough evidence to sustain a verdict in its favor."); *Tyger Const. Co. Inc.,* 29 F.3d at 142 ("[a]n expert's opinion should be excluded when it is based on assumptions which are speculative and are not supported by the record.") Similarly, Koon states that cooling water discharges may have contained heavy metals, because many corrosion-preventing additives used during this period contained heavy met-

2. When read in the light most favorable to Textron, McKee's testimony indicates that he hauled some of Burlington's waste to the Harwell Road site on two occasions. On one occasion he brought one partial load of wastewater and perhaps sludge to the Harwell Road site before determining that this was inefficient and emptying the rest of the tank onto Burlington's land. On another occasion he skimmed some "crust" off Burlington's tank. Thus the amount of waste is trivial.

3. As noted, McKee recalled working for Burlington probably twice during the period in question, and Burlington's records indicate that he was paid for work on two occasions—once in 1975 and once in 1976. Given this evidence, the only inference to be drawn from the testimony is that McKee worked for Burlington in 1975 and 1976.

als. But Koon admits that he does not know what additives Burlington used in 1975 or 1976, when McKee picked up Burlington's waste, and he has no idea what amount of additive was added. Under these circumstances, Koon's opinion suggests a mere possibility, not a probability, that any cooking water additives used by Burlington contained heavy metals and it cannot serve as the significantly probative evidence that is necessary to withstand a motion for summary judgment. *See Sakaria*, 8 F.3d at 172–73 (summary judgment should be granted where expert opinion suggests merely a possibility, as opposed to a probability, "precisely to guard against raw speculation by the fact-finder."); *see also, Dana Corp. v. American Standard, Inc.*, 866 F.Supp. 1481, 1498 (N.D.Ind.1994) ("[T]here must be evidence beyond a witness effectively saying 'anything's possible', because such evidence is not sufficient to support a finding."). As a result, Textron's claim rests ultimately on the test results from 1974, but absent evidence indicating those results are typical, they are not significantly probative. *Cf. Renaud v. Martin Marietta Corp.*, 749 F.Supp. 1545, 1553 (D.Colo.1990) ("[i]t is unsound scientific practice to select one concentration measured at a single location and point in time and apply it to describe an 11–year period."), *affirmed* 972 F.2d 304, 308 (10th Cir.1992) ("We agree, ourselves observing that this would seem little more than common sense ..."); *see also, Dana Corp. v. American Standard, Inc.*, 866 F.Supp. 1481, 1499 (N.D.Ind.1994) ("Expert opinions premised upon speculation and conjecture are insufficient to create a genuine issue of material fact to survive summary judgment.") *citing Thomas v. FAG Bearings Corp.*, 846 F.Supp. 1382, 1393 (W.D.Mo.1994), *on reconsideration in part on other grounds sub nom., Thomas (Elaine) v. FAG Bearings Corp.*, 860 F.Supp. 663 (W.D.Mo.1994) ("When basic foundational conditions themselves are conjecturally premised, it then behooves a court to remove the answer from one of admissible opinion to one of excludable speculation.").

### 2. *Phenol.*

Textron also argues that phenols were present in Burlington's wastewaters, and therefore present in the sludge (and perhaps "crust") that McKee allegedly removed from Burlington's tank in 1975 and 1976. Here, Textron's assertion rests on a 1971 permit application, filled out by a Burlington employee, which indicates that phenols were present in Burlington's wastewater discharge. Textron also points to a document which indicates that the additives which Burlington put into its air conditioning units contained "halogenated phenols" and an interoffice memorandum generated by Burlington in 1978 which indicates that the wastewater generated by the air conditioning units was discharged "into plant sewage" on a weekly basis—at least by that time. Based on this evidence Koon opines, "Since phenol sorbs strongly to organic material, it is possible that phenol adsorbed onto the sludge in the treatment system."

As the tentative nature of Koon's opinion suggests, Textron has failed to produce significantly probative evidence from which a reasonable fact-finder could find that any waste hauled by McKee contained phenols. Even assuming that the 1971 application is correct, it is a mere scintilla of evidence. Indeed, Koon admitted that he had no way of knowing whether the phenols referenced in the 1971 permit application were discharged into Burlington's waste system in 1975 and 1976 when McKee allegedly took waste from its system. Thus, once again, based on one permit application, Textron asks the Court to infer a consistent discharge over a five-year period. Interestingly, Textron ignores the 1974 report it earlier relied on to claim that Burlington's waste contained heavy metals; that report represents that Burlington's wastewater does *not* contain phenols. Again, the Court notes this contradiction not because it is weighing the evidence, but simply because it captures the obvious: one test is not a sufficient basis for extrapolation absent additional evidence which establishes that those results are a reliable indicator of typical discharges. *Cf. Renaud v. Martin Marietta Corp.*, 749 F.Supp. 1545, 1553 (D.Colo. 1990) ("[i]t is unsound scientific practice to select one concentration measured at a single location and point in time and apply it to describe an 11–year period."), *affirmed* 972 F.2d 304, 308 (10th Cir.1992) ("We agree,

ourselves observing that this would seem little more than common sense ...") Moreover, Textron's expert admitted that phenols rapidly biodegrade. For this reason, his opinion states that if McKee picked up Burlington's waste "soon" after it entered the wastewater system, then it would probably contain phenols because sufficient time would not have elapsed for the phenol to biodegrade. Again, this is mere conjecture on Koon's part. He has no idea what the strength of the phenol solutions discharged into Burlington's system was or how much time elapsed between the discharge of phenol and McKee's two pickups. Thus, he has no way of knowing whether any phenols placed in the system biodegraded before McKee hauled these wastes. *See Sakaria,* 8 F.3d at 172–73.

### 3. *BTEX From Varsol.*

Once again the perigee of Koon's "expert opinion" is his assertion that BTEX probably entered Burlington's wastewater system because Burlington's employees probably dumped Varsol down sinks and toilets at the plant. The basis for this assertion is Koon's "expert opinion" that many people dumped Varsol down sinks and toilets. This general opinion about what disposal practices were possibly employed at the Burlington plant is not the specific evidence needed to withstand summary judgment. *See Sakaria, supra* at 172–73 (summary judgment should be granted where expert opinion suggests merely a possibility, as opposed to a probability, "precisely to guard against raw speculation by the fact-finder."); *Alevromagiros,* 993 F.2d at 421 ("[t]he credibility of competing experts is a question for the jury only if the party with the burden of proof has offered enough evidence to sustain a verdict in its favor."). Indeed, the only evidence on this point flatly contradicts Koon's bare assertion. A memo generated by Burlington in 1973 clearly indicates that Varsol was stored in 55–gallon drums and disposed of on the property. Another memo indicates that this practice was initiated towards the end of 1971. Also Duckworth, an employee of Burlington throughout this period, testified that Varsol was kept in 55–gallon drums that were collected by someone other than McKee. Textron cannot rely on Koon's testimony as to some generalized custom in the industry to rebut the specific evidence of Burlington's disposal practices because the inference it asks the Court to draw is unreasonable in light of competing inferences. *See Comprehensive Technologies v. Software Artisans,* 3 F.3d 730, 737 (4th Cir.1993) (The inferences a court is asked to draw by expert testimony must be reasonable in light of competing inferences). Realizing this, Textron and its expert are reduced to asserting that Burlington employees could have dumped Varsol down the sinks and toilets even though it was not Burlington's ordinary practice. But we have already observed that this sort of conjecture is simply not sufficient to withstand a motion for summary judgment. *See e.g. Tyger Const. Co. Inc.,* 29 F.3d at 142 ("[a]n expert's opinion should be excluded when it is based on assumptions which are speculative and are not supported by the record.") *see also, Dana Corp. v. American Standard, Inc.,* 866 F.Supp. 1481, 1498 (N.D.Ind.1994) ("[T]here must be evidence beyond a witness effectively saying 'anything's possible', because such evidence is not sufficient to support a finding.")

### 4. *Household Hazardous Substances.*

As noted earlier, the Ranlo wastewater treatment system received household wastewater from approximately 100 houses in the "mill village" in 1975 and 1976 when McKee hauled Burlington's waste on two occasions. Relying on a few recent studies concerning hazardous substances present in the waste of certain sampled households, Koon asserts that he can opine as to the amount and kind of household hazardous waste that was generated by these mill village homes in 1975–76.

Under the Federal Rules, the trial judge must ensure that any and all expert testimony is not only relevant but also reliable. *Daubert,* — U.S. at ——, 113 S.Ct. at 2786. "[I]n order to qualify as 'scientific knowledge,' an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation—*i.e.,* 'good grounds' based on what is known." *Id.* at ——, 113 S.Ct. at 2795. A court confronted with a

proffer of expert testimony must determine whether an expert is proposing to testify as to (1) scientific knowledge that will (2) assist the trier of fact, and "[t]his entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and whether the reasoning or methodology properly can be applied to the facts in issue." *Id.* at ——, 113 S.Ct. at 2796. Among the factors relevant to determining whether a proffer consists of "scientific" knowledge are (1) whether the theory or technique has been tested, (2) whether it has been subject to publication and peer review, (3) the known or potential rate of error, and (4) general acceptance in the community. *Id.* at ——, 113 S.Ct. at 2797. In addition, Rule 702 requires the court to determine whether the proffered testimony will be "helpful to the trier of fact" a condition that "goes primarily to relevance." *Id.* at ——, 113 S.Ct. at 2795. Here a court must ask whether the proffered testimony is "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Id.* at ——, 113 S.Ct. at 2796 (*citing U.S. v. Downing*, 753 F.2d 1224, 1242 (3rd Cir.1985)).

█ For two principal reasons, the Court finds that Koon's opinion on these matters is not sufficient to create a genuine issue of material fact. First, the Court finds that Koon's opinion does not qualify as "scientific knowledge" under the test enunciated in *Daubert*. For example, some of the studies relied upon by Koon concern household *solid* waste and Koon admitted in his deposition that these studies did not have any significant connection with hazardous substances present in the household *liquid* waste that was treated *via* Burlington's system. Also, several of the studies caution that they should not be used as a basis for further extrapolation until further studies are completed. For example, one study forthrightly states:

> There is very little knowledge about the presence of HHW [Household hazardous waste] in the residential wastestream. . . .

None of the quantification projects could be considered statistically valid.

*A Survey of Household Hazardous Wastes and Related Collection Programs,* p. 1–2, United States Environmental Protection Agency, Office of Solid Waste and Emergency Response, Washington, D.C., 1986.[4] Other studies relied on by Koon have similar *caveats* which caution the reader from extrapolating from the data contained therein. For example, an EPA study of hazardous substances in household wastewater states "Only a careful consumer product survey could adequately determine the amount of the chemicals used in the home." *Sources of Toxic Compounds in Household Wastewater,* United States Environmental Protection Agency, Municipal Environmental Research Lab., Cincinnati, OH, August 1980. These cautions indicate that this body of literature has not reached the point where experts are willing to venture the sort of broad conclusions Koon has essayed in this case and do no more than confirm common sense: absent a high degree of statistical certainty, general studies cannot be used to draw conclusions in specific cases. The very studies relied upon by Koon indicate that they do not provide the statistical certainty that would arguably make them a reliable basis for testimony in this regard.

Also, the Court finds that studies relied upon by Koon, and therefore his opinion in this matter, are not sufficiently tied to the facts of this case. The earliest study relied upon by Koon is dated 1980. That study cautions, "Obviously, not all of these compounds will be found in household wastewater since a number of factors come into play such as changes in product usage within individual homes and even entire communities, and sampling techniques which may miss low concentrations . . . Only a careful consumer product survey could adequately determine the amount of chemicals used in the home. *Sources of Toxic Compounds in Household Wastewater,* United States Environmental Protection Agency, Municipal Environmental Research Lab., Cincinnati, OH, August 1980.

---

4. In its brief, Textron attempts to minimize the effect of this disclaimer by noting that it comes from a study concerning solid waste which is "the least significant to Dr. Koon." The Court agrees that the applicability of these studies is insignificant but notes that Dr. Koon did rely on them.

The remainder of the studies range from 1985–1993 and contain similar *caveats*. Koon has opined in conclusory terms that the houses in Burlington's mill village were "typical" so that these studies can be used to describe the wastewater from these homes. Koon's statement in this regard is a naked assertion; the socio-economic circumstances of the neighborhoods sampled are specifically listed in these studies precisely because they affect test results. But he offers nothing by way of comparison that would equate the households connected to Burlington's system with those sampled in the studies. Nor has he addressed whether the quantity or quality of household hazardous wastes entering waste-streams in 1980 and beyond are sufficiently similar to those available in 1975 and 1976 to merit comparison.

In the Court's view, these deficiencies in Koon's opinion, when taken together, indicate that his opinion that Burlington's waste contained household hazardous wastes is not sufficiently reliable to withstand a motion for summary judgment. The studies relied upon by Koon do not provide him with a reliable basis to offer general opinions about the quality or quantity of *typical* household wastewaters with any certainty. As such, there is substantial room for error when such data is relied upon for extrapolation. Second, Koon's opinion is not sufficiently tied to the facts of this case, because he has offered no basis for his opinion that the studies relied upon are sufficiently similar to the households connected to Burlington's waste-water system to merit comparison. Therefore, the Court finds that Koon's testimony is not sufficiently reliable to withstand a motion for summary judgment. *See Sakaria*, 8 F.3d at 172–73 (Summary judgment should be granted where expert opinion suggests merely a possibility, as opposed to a probability, "precisely to guard against raw speculation by the fact-finder."); *see also Daubert*, —— U.S. at ——, 113 S.Ct. at 2795 (expert knowledge must be more than subjective belief or unsupported speculation).

Textron asserts that Burlington's wastewaters and sludge contained heavy metals, phenols, BTEX and unidentified household hazardous substances. But for the most part,

Textron's claim rests on the largely unsupported assertions of its expert, Dr. Koon. Textron has failed to produce the specific concrete facts that would provide a basis for that opinion, and therefore, that opinion is insufficient to withstand Burlington's motion for summary judgment. Where Textron has managed to produce some concrete evidence that supports its claims, it offers a mere scintilla of evidence that is not significantly probative and would not allow a reasonable fact-finder to return a verdict in its favor. For these reasons, Burlington's motion for summary judgment will be granted.

**NOW, THEREFORE, IT IS ORDERED** that Defendant Burlington Industries, Inc.'s Motion for Summary Judgment, filed December 2, 1994 (document # 68), be, and hereby is **GRANTED.** A judgment will be filed simultaneously with this Memorandum of Decision and Order.