**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

JAMES C. ADKINS,
Plaintiff-Appellant,

v.

ROBERT B. SCARLETT; HOWARD M.
HENESON; HENESON & SCARLETT,
Defendants-Appellees,

and

MARY BETH MCNAMARA; HARBOR
BANK OF MARYLAND,
Defendants,

NUTTER FUNERAL HOMES,
INCORPORATED,
Party in Interest.

No. 96-2354

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Catherine C. Blake, District Judge.
(CA-94-843-CCB)

Argued: August 13, 1997

Decided: March 3, 1998

Before RUSSELL,* Circuit Judge, HALL, Senior Circuit Judge,
and MICHAEL, Senior United States District Judge for the
Western District of Virginia, sitting by designation.

_____

*Judge Russell heard oral argument in this case but died prior to the
time the decision was filed. The decision is filed by a quorum of the
panel pursuant to 28 U.S.C. § 46(d).

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Paul Howard Zukerberg, Washington, D.C., for Appellant. David John Wildberger, ILIFF & MEREDITH, P.C., Baltimore, Maryland, for Appellees. **ON BRIEF:** Kathleen Howard Meredith, ILIFF & MEREDITH, P.C., Baltimore, Maryland, for Appellees.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

This case arises out of a Byzantine chain of events focused around an attempt to purchase a funeral home in Baltimore, Maryland. The record before the court is simply not sufficient to permit a full understanding of all of the maneuvers in which the parties have engaged. The following recitation of facts is drawn, to the degree possible, from that record.

While this appeal is from actions of the district court in this suit, it is necessary for an understanding of the case to recite the bankruptcy court proceedings, together with various ancillary activities and actions.

The Nutter Funeral Home ("Nutter") provided mortuary services to the Baltimore community for many years. Nutter, then owned by Edward R. Butler, was sold in May 1987 to Rhema Development Corporation ("Rhema"), owned by the Reverend Franklin Showell and his wife, Ella Showell. The terms of sale included Mr. Butler taking back a promissory note for $389,000 ("the Note"), to secure which note, Rhema and the Showells pledged one hundred percent of the

2

shares of stock in Nutter back to Mr. Butler. Thus, at the closing of the sale, Rhema owned one hundred percent of the shares of stock in Nutter, the stock being burdened by what appears to be a lien to secure the payment of the note. Butler in turn owned the note, and such security as a lien on all the shares of stock of Nutter may have afforded him. Shortly after the sale, Rhema and the Showells ceased to pay on the Note, and Mr. Butler sued in state court to enforce the contract of sale of May 1987.

In March of 1990, Rhema and the Showells each filed for protection under Chapter 11 of the Bankruptcy Code. Mr. Butler's enforcement action to enforce the contract was stayed automatically. In July 1990, Mr. Butler and the Palladium Corporation ("Palladium"), of which Mr. Butler was an insider, also filed for Chapter 11 protection. Mr. Butler retained Robert B. Scarlett and his firm, Heneson and Scarlett, to represent Butler and Palladium in bankruptcy court.

James C. Adkins, previously the owner of a funeral home in the District of Columbia, saw Nutter as a potentially profitable operation and, in late 1990, offered Mr. Butler $20,000 in cash for the shares of stock in Nutter on which Mr. Butler held the lien securing the note. Those shares were held in the bankruptcy estate of Rhema and the Showells, subject to the lien, and had been declared worthless by the bankrupt Rhema and Showells. The record does not disclose by what mechanism the conveyance of ownership in the stock would have been effected, but the details of this offer are of little moment, since no sale resulted from this Adkins offer to Mr. Butler. In persistence, Mr. Adkins met, in early 1991, with Mr. Scarlett, counsel for Mr. Butler, to discuss a purchase of Nutter, although Mr. Adkins had already retained the firm of Frank, Bernstein, Conaway, and Goldman to assist in the purchase of Nutter. It does not appear that the Frank firm participated in any way in this meeting between Messrs. Adkins and Scarlett. At that time, Mr. Adkins had only $250,000 to offer for Nutter. Mr. Scarlett suggested that Mr. Adkins hire Mr. Scarlett to develop a competing reorganization plan for the Butler estate. In return for this plan preparation, Mr. Adkins agreed to pay both his own legal fees and those of Mr. Butler. The letter of retainer sent from Mr. Scarlett to Mr. Adkins confirms that Mr. Adkins retained Mr. Scarlett for advice as to "how [Mr. Adkins] might go about purchasing the funeral home license and land involved in [the Rhema,

3

Showell, and Butler/Palladium] bankruptcy proceedings." Joint Appendix 137. It does not seem that any question of the propriety of Mr. Scarlett's simultaneous representation of both Mr. Adkins and Mr. Butler arose at this meeting, although the strong potential for adverse positions of the parties must have been apparent. Mr. Scarlett eventually received a $5,000 retainer for his services, of which retainer fee Mr. Scarlett failed to inform the bankruptcy court in Mr. Butler's estate.

On January 18, 1991, Mr. Scarlett filed a motion for relief from the automatic stay of the Butler state court suit imposed by the Rhema and Showell bankruptcy. Mr. Scarlett indicated that his goal was to seek recovery of Nutter or the Nutter stock for the benefit of Mr. Butler's unsecured creditors.

Mr. Adkins and his business associate, Nathaniel Sims, then came to an oral settlement with Mr. Butler and the Showells in which Mr. Adkins and Mr. Butler agreed not to contact any creditor of either the Showells or Rhema and Mr. Butler agreed to release all liens against the shares of Nutter, in exchange for $350,000 paid by the Showells and Rhema, to be divided between Mr. Adkins and Mr. Butler. It does not appear that Mr. Scarlett stated to the bankruptcy court that Mr. Scarlett was simultaneously representing both Mr. Butler and Mr. Adkins. The parties agreed to the settlement plan on the record before Judge Derby on March 1, 1991. Joint Appendix 637-38. This settlement would free the shares of stock in Nutter and leave those shares in the unencumbered ownership of the bankrupt estates of Rhema and the Showells. For several weeks after the meeting with Judge Derby, the parties were unable to arrive at a written settlement agreement to which Mr. Adkins, Mr. Butler, and the Showells could agree.

On May 7, 1991, Mr. Scarlett forwarded a proposed written settlement agreement to the attorney for the Showells and Rhema, Marc Kivitz.* In the cover letter to the proposed agreement, Mr. Scarlett

_____

*The record does not disclose any date for the acceptance of a final agreement by Mr. Butler, Rhema, and the Showells. A final such agreement must have been reached some time before August 1991 since in that month Rhema and the Showells defaulted in the payments required by the settlement agreement.

4

indicated that he had "instructed Mr. Adkins that he would have to retain separate counsel," because Mr. Scarlett"perceived a conflict developing." Joint Appendix. However, on June 10, 1991, Mr. Scarlett billed Mr. Adkins, in a bill including work performed after the May 7, 1991 letter to Mr. Kivitz. Moreover, on June 28, 1991, Mr. Scarlett wrote to Mr. Adkins requesting payment of a bill for $7,458.81 and stating, "Mr. Kivitz filed, without my approval, a Notice of Settlement. I promptly filed an objection to the Notice, raising those objections which you set forth in our conversations. I project that the Bankruptcy court will schedule a hearing on our objection." Joint Appendix 853. In the meantime, Mr. Adkins consulted numerous attorneys regarding a purchase of Nutter stock and real estate. He also continued to be represented by Frank, Bernstein, Conaway, and Goldman.

On July 17, 1991, the bankruptcy court approved the lift stay settlement, to which Mr. Adkins had not agreed, in the Rhema and Showell bankruptcies. No settlement had been filed at this time in Mr. Butler's bankruptcy proceeding, though it would appear that approval of this settlement by the bankruptcy court in the Butler bankruptcy would have been highly desirable, if not necessary. In August 1991, Rhema and the Showells defaulted on the balance of their $350,000 settlement payment. Although the settlement agreement contained a default clause granting certain remedies to the injured party -- here, Mr. Butler -- no action to invoke those remedies was undertaken. Rather, the parties to the settlement allowed Rhema and the Showells additional time to gather the necessary funds to fulfill their obligations under the settlement agreement. At a meeting held on October 15, 1991, Mr. Butler agreed to release any lien or other claim to the shares of stock in Nutter in exchange for immediate payment of the remainder $350,000 settlement proceeds from Mr. Showell. These funds were paid over but not deposited into the Butler bankruptcy estate, as the July 1991 settlement agreement filed in the Showell and Rhema bankruptcies had arranged. Instead, Mr. Butler met with Mr. Adkins on October 16, 1991, at which time the two split the funds provided by Rhema and Showell for the shares of Nutter stock: Mr. Butler retained a check for $150,000 and provided Mr. Adkins with the check for $100,000, presumably by agreement between them, though it seems also that at least the sum of $250,000 thus divided should have gone to the bankruptcy estate as an asset in that estate. Since the settlement

5

agreement had not been presented to the bankruptcy court in the Butler bankruptcy, knowledge of this transaction did not come to the attention of the bankruptcy court in Mr. Butler's bankruptcy.

The conclusion of these transactions thus left Rhema and the Showells bankruptcy estates as owners of the stock of Nutter, free of any Butler lien or other Butler claim.

On October 17, 1991, Mr. Scarlett filed a Notice of Settlement in the Butler estate. As with the Rhema and Showell bankruptcy settlement, the Notice indicated that all settlement funds received in the Butler estate would be placed in a separate escrow account. However, on November 11, 1991, Mr. Scarlett learned that the settlement funds had been disbursed on October 16, 1991. Mr. Scarlett wrote to Mr. Butler two days later requesting that the funds be placed into the escrow account immediately. On that same day, Mr. Butler terminated Mr. Scarlett's representation.

Mr. Scarlett filed an emergency motion and a complaint against both Mr. Butler and Mr. Adkins seeking a court order directing the payment of the settlement funds into the court's escrow registry of the settlement funds. On November 18, 1991, the court ordered Messrs. Adkins and Butler to pay the settlement funds into the escrow account. Neither complied and on June 2, 1992, the bankruptcy court entered an Order for Civil Contempt with a judgment in the amount of $350,000 plus interest and attorneys' fees against Messrs. Adkins and Butler, jointly and severally. Mr. Adkins appealed but said appeal was dismissed as untimely.

On April 22, 1993, the bankruptcy court issued a Show Cause Order directing Messrs. Adkins and Butler to show cause why they should not be incarcerated for their refusal to comply with the November 18, 1991 and the June 2, 1992 orders. After a hearing, the court ordered both defendants to be incarcerated until they purged themselves of civil contempt. The United States District Court of Maryland upheld this contempt order. The defendants eventually purged themselves of contempt, Mr. Butler by testifying as to the disposition of the funds he had retained, and Mr. Adkins by returning the funds he had obtained from Mr. Butler.

6

Mr. Adkins brought the current suit against Mr. Scarlett in January 1994, alleging professional negligence, breach of contract, fraud and deceit, and breach of fiduciary duty arising out of Mr. Scarlett's representation of Mr. Adkins in Mr. Adkins's attempts to purchase Nutter. The plaintiff-appellant claimed that his damages included legal fees paid to Mr. Scarlett, the value of Nutter (which he asserts he would own but for the perfidy of Mr. Scarlett), and the difference between the $350,000 Mr. Showell eventually paid for the shares of Nutter and the $20,000 Mr. Adkins offered Mr. Butler for those same shares.

On April 28, 1995, the district court granted partial summary judgment in favor of the appellee as to any losses sustained by appellant after Mr. Scarlett ceased to represent him because the damages then sustained were too remote from Mr. Scarlett's representation in the Nutter matter. Discovery after the district court's first grant of summary judgment revealed additional evidence, and the appellee filed a second motion for summary judgment. On August 20, 1996, the district court granted summary judgment for the appellee on all remaining matters, ruling that the appellant had failed to create a genuine issue of material fact as to whether the appellee was the proximate cause of claimed damages; that appellant's retention of numerous attorneys in the matter broke any possible causal link between the acts of the appellee and the damages claimed; and that, as to the attorneys' fees paid to Scarlett, the bankruptcy court in the Butler estate was the proper forum in which to seek return of said fees.

On review, Appellant argues that the district court erred in granting summary judgment both in April 1995 and in August 1996. The court reviews the grant of summary judgment in the trial court de novo. See Stone v. Liberty Mut. Ins. Co., 105 F.3d 188, 191 (4th Cir. 1997).

In Maryland, a plaintiff must allege three elements in a claim for attorney malpractice: "(1) the attorney's employment, (2) his neglect of a reasonable duty, and (3) that such negligence resulted in and was the proximate cause of loss to the client." Ferguson v. Cramer, 695 A.2d 603, 605 (Md. Ct. Spec. App. 1997), citing Kendall v. Rogers, 31 A.2d 312 (1943). The connection between the actions of the defendant and the injury must be legally sufficient to allay policy considerations about the reasonable limits of responsibility for misconduct.

7

See, e.g., Peterson v. Underwood, 264 A.2d 851 (Md. 1970). Proof of causation must also be established to a "probability." Sakaria v. Trans World Airlines, 8 F.3d 164, 172 (4th Cir. 1993). Sakaria explains that such probability is required "precisely to guard against raw speculation." Id. at 172-73.

Appellant argues first that the district court erred in granting defendant summary judgment in April 1995 on the claims involving damages incurred by Mr. Adkins' confrontation with the bankruptcy court. The district court found no proximate cause between Mr. Scarlett's representation and Mr. Adkins' interaction with the bankruptcy court. Mr. Scarlett last billed Mr. Adkins in June 1991 and Mr. Adkins' confrontations with the bankruptcy court began in November 1991. Mr. Adkins refusal to comply with the court's order to tender the $100,000 settlement money to the escrow account was purely his own action and did not arise in any way out of his relationship with Mr. Scarlett. In fact, Mr. Adkins had other legal representation at this time. Thus, the district court correctly determined that Mr. Adkins failed to establish a legally cognizable link between Mr. Scarlett's actions and Mr. Adkins' alleged injuries after the filing of the Complaint to Turnover Certain Estate Monies to Court's Escrow Account. The district court appropriately granted summary judgment to the defendant.

Mr. Adkins also appeals the August 1996 order in which the district court granted summary judgment on appellant's claims for damages equal to the value of Nutter Funeral Homes, the costs of legal services by Mr. Scarlett, and the $330,000 difference between what appellant offered for the Nutter shares and what the Showells and Rhema ultimately paid for them.

Under Maryland law, expert testimony may be necessary to prove a violation of the standard of reasonable care "where the common knowledge or experience of laymen is [not] extensive enough to recognize or infer negligence from the facts." Homa v. Friendly Mobile Manor, Inc., 612 A.2d 322, 350-51 (Ct. Sp. App. Md. 1992), citing Fishow v. Simpson, 462 A.2d 540 (1983). In the instant case, the intricacies of bankruptcy litigation and attorney duties of representation were sufficiently complex to require expert testimony regarding the possibility of a violation of the standard of reasonable care. Neither

8

expert produced by appellant indicated causation between the alleged malpractice and the failure to purchase to any degree of certainty. Roger M. Whelan, a former bankruptcy judge, specifically stated that he could not "accurately assess [whether Mr. Adkins would have been successful in procuring Nutter but for Mr. Scarlett's breaches in the standard of care] based on the statement of facts." Joint Appendix 19. Mr. Adkins never had the $330,000 or $2,000,000 (the estimated value of the business) which he seeks as damages in this action and he cannot show with any certainty that the business could have been obtained for the significantly lower funds that he did have. Without expert testimony indicating that the alleged breach of care was the probable cause of the failure to purchase the funeral home, summary judgment was appropriate.

The district court also granted summary judgment in favor of the appellee as to the retainer fee paid by Mr. Adkins to Mr. Scarlett. The district court found that the appellant should have filed in the bankruptcy estate of Mr. Butler the claim for the return of the amount of the retainer fee. As the retainer and legal fees were caused in part by Mr. Scarlett's representation of Mr. Butler, those fees could have been returned to Mr. Adkins from the Butler bankruptcy. Mr. Whelan, a former bankruptcy judge, testified that "there is a likelihood" that the bankruptcy court would have returned the fees to Mr. Adkins had Mr. Adkins complied with the court's turnover order. Therefore, Mr. Adkins failure to file a claim at the proper time, in the proper forum, caused his loss of said funds. The grant of summary judgment by the district court is affirmed as to the legal fees as well.

For the aforementioned reasons, the district court's order will be affirmed in its entirety.

AFFIRMED

9